**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

────────────────────────────

**HINDSIGHT SOLUTIONS, LLC,**

                    Plaintiff,

      — against –

**CITIGROUP INC., ET AL.,**

             Defendants.

────────────────────────────

**11 Cv. 5368 (JGK)**

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

    This lawsuit arises from a contract between the plaintiff, Hindsight Solutions, LLC, ("Hindsight") and the defendant CitiMortgage, Inc. ("CitiMortgage"). Hindsight agreed to provide CitiMortgage with a proposal to reduce the overall maintenance costs that CitiMortage paid annually to IBM for the use of IBM's FileNet software. CitiMortgage agreed to pay Hindsight 30% of the actual savings that CitiMortgage recognized over a two-year period compared to the annual maintenance costs that were currently billed by IBM. Hindsight claims that CitiMortgage failed to pay amounts that were owed under the contract. Hindsight also claims that CitiMortgage failed to pay amounts that Hindsight was owed for its work in connection with an audit by KPMG. Hindsight argues that, to the extent any amounts were not owed under the contract, Hindsight is entitled to payment under various quasi-contractual theories. Hindsight

also contends that CitiMortgage defrauded it by misrepresenting that there was a "software deployment freeze" that caused Hindsight to withdraw its efforts to obtain compensation based on alleged software savings under the contract.  CitiMortgage denies that there were any misrepresentations and contends that Hindsight was paid exactly what it was owed under the contract.

Various claims and defendants were dismissed over the course of the litigation.  Hindsight's remaining claims are for breach of contract, fraudulent misrepresentation, fraudulent inducement, and quasi-contractual claims for unjust enrichment, quantum meruit, and promissory estoppel.  Hindsight has sued CitiMortgage and Citigroup, as well as individual defendants, Gil Scheibelhut and Harold Hatter.

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship.

The Court conducted a non-jury trial in this case from September 8, 2014 through September 16, 2014.  Having considered all of the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**I. BACKGROUND**

1.   Hindsight is a Delaware limited liability company that
was formed in January 2007.  Pl. Trial Ex. ("PTX") 1.  Its three
members are citizens of South Carolina, Kansas, and California.
Am. Comp. ¶ 1.  Michael Hinds is Hindsight's chief executive
officer, founder, and sole employee.  Tr. 64, 293.  Hinds, a
certified engineer, began working at FileNet in 2000 as a
technical engineering consultant.  Tr. 61.  He worked in
compliance to curb software piracy and developed a program to
track compliance with software licenses.  Tr. 61-62.  Hinds
continued to work at FileNet after it was acquired by IBM in
2006, until he left to start Hindsight in 2007.  Tr. 63, 87.

2.   Defendant Citigroup is a Delaware corporation with its
principal place of business in New York.  Am. Comp. ¶¶ 3-4.
Defendant CitiMortgage is a New York corporation with its
principal place of business in Missouri.  Am. Comp. ¶ 6.
(Defendants Citigroup and CitiMortgage are referred to
collectively as "Citi").

3.   Defendants Scheibelhut and Hatter are employees of
Citigroup with offices in Texas and Florida respectively.
Schiebelhut and Hatter are citizens of those respective states.
See Am. Compl. ¶¶ 3-8, 11-12; Answer ¶¶ 3-8, 11-12.  Scheibelhut
is a Director of Production Software Support for Citigroup.  Tr.

535.  He is responsible for keeping the applications that
support Citi's mortgage business up and running.  Tr. 541.
Hatter is a Director of Supplier Governance in Citigroup's
Global Technology Resource Strategy group.  Tr. 912.  Hatter's
role is to facilitate the contracting process by assisting
internal clients at Citi such as Scheibelhut with the vendor
procurement process.  Tr. 913-15.

**II. THE BEGINNING OF THE RELATIONSHIP BETWEEN HINDSIGHT AND
CITI**

4.  CitiMortgage uses FileNet software to manage images
stored in a computerized document repository under licenses
purchased from IBM.  Tr. 669.  In 2008, FileNet was one of three
different platforms CitiMortgage used to store document images.
Tr. 527.  CitiMortgage's FileNet licenses are perpetual; once
purchased CitiMortgage continues to own the license in
perpetuity.  Tr. 76; PTX 6, at 95974.  In addition to the one-
time license purchase, IBM charges CitiMortgage ongoing annual
"maintenance" fees.  Tr. 670-71, 843.  The annual maintenance
fees are the only ongoing fees charged after a license is
purchased.  Tr. 844.

5.  Maintenance is the annual fee paid to IBM for
continued use of existing licenses and technical support once
the customer owns the license.  Tr. 670.  Once purchased, a

4

customer cannot recoup the cost of a license but it can deactivate ongoing maintenance. Tr. 300-01, 778. If a user deactivates ongoing maintenance, the user may reactivate it later. Tr. 778.

6. CitiMortgage's FileNet licenses are governed by a contract (the "IBM-FileNet Contract") dated August 5, 2003. PTX 6. The IBM-FileNet Contract states that it permits CitiMortgage affiliates to use CitiMortgage's FileNet system. PTX 6, at 95961, 95975. The IBM-FileNet Contract was the governing contract that Hindsight eventually reviewed for purposes of its work. Def. Ex. ("DX") 136; DX 150.

7. In December 2007, before Hindsight approached CitiMortgage, CitiMortgage owned FileNet licenses that permitted over 49,000 internal users and two million external users to use its FileNet system. Tr. 784-85.

8. Prior to the contract between CitiMortgage and Hindsight, CitiMortgage paid IBM $1,557,493.98 annually for maintenance on FileNet licenses. DX 160. In December 2007, Hinds contacted Citi's James Ford to propose that Hindsight could assist in reducing Citi's ongoing FileNet costs. Tr. 65-66.

9. On January 29, 2008, Hinds again approached Ford with a "specific goal" of reducing Citi's "annual IBM-FileNet ECM

5

maintenance." PTX 2; Tr. 841. On March 16, 2008, Hindsight contacted Ford and provided a summary of its "no cost" proposed engagement to enable CitiMortgage to save on its annual maintenance. DX 3; Tr. 842.

10. Hindsight offered to perform an initial analysis at no cost or obligation to CitiMortgage. DX 3; Tr. 295, 842. Hindsight agreed that at the conclusion of that analysis, it would present Citi with a summary of projected maintenance savings at which point CitiMortgage could elect to retain Hindsight or not. Tr. 68-70, 674-75, 842; DX 3.

11. To enable Hindsight to perform its no cost analysis, CitiMortgage provided Hindsight with reports generated directly from the FileNet system. DX 25. The reports CitiMortgage provided to Hindsight showed the users who accessed the FileNet system. Tr. 770-75. Hindsight used these reports to determine the number of users accessing FileNet so it could recommend reductions in CitiMortgage's FileNet maintenance costs without any negative impact on CitiMortgage's usage of the FileNet system. DX 17; DX 25; DX 27; Tr. 843.

12. On May 22, 2008, Hindsight advised CitiMortgage that the reports CitiMortgage provided to Hindsight to analyze the system were "perfect" and "exactly what [Hindsight] needed." DX 25.

6

13.  On May 8, 2008, after its initial no cost analysis, Hindsight presented Ford with an "approximate 24-month savings projections" with respect to annual maintenance for CitiMortgage and CitiMortgage's affiliate CBNA.  DX 17.  CBNA used the CitiMortgage FileNet system before Hindsight was retained. DX 17; Tr. 846.

14.  The "approximate savings projections" were based on reducing Citi's "overall software maintenance."  DX 17.  The "approximate 24-month minimum savings projections" were $1,116,774 (reflecting a 30% reduction in Citi's "current 24-Month software maintenance calculation").  DX 17, at 86735.  The proposed compensation to Hindsight was based on "30% of CitiGroup's actual 24-month savings projections (Though, actual customer savings should continue well beyond 24-months)." DX 17, at 86735; Tr. 844-46.

15.  On May 13, 2008, Hindsight sent Ford its Standard Terms and Conditions.  DX 19.  The Hindsight Standard Terms and Conditions provided compensation based on savings of annual software maintenance.  Hindsight's Standard Terms and Conditions provide:

> None of the Services referenced under this MSA guarantee Hindsight will be successful in reducing Customers annual software maintenance.  However, if using Hindsight's restructuring recommendations, Hindsight and/or Customer are unable to successfully negotiate at least a 20 percent

7

cost reduction off the current annual software maintenance (as referenced in the 'Scope of Services Delivery Document'), Customer will not be required to compensate Hindsight for the Service Fees outlined in the Agreement.

DX 19, at 87796.  Hindsight's Standard Terms and Conditions did not provide for compensation based on new users or software deployments.  DX 19; Tr. 331, 846-48.

16.  Hindsight's Standard Terms and Conditions contained a merger clause providing that "[t]his Agreement constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations, representations, and proposals (whether oral or written) between Hindsight Solutions and Customer."  DX 19, at 87797.  Hinds considered it good business practice to include a merger clause in Hindsight's Standard Terms and Conditions and not to rely upon oral discussions. Tr. 412-13.

17.  On May 28, 2008, Hindsight sent Citi its proposed work order outlining the scope of Hindsight's engagement.  DX 32. Hindsight's May 28 proposed work order stated that its analysis was an "effort to immediately reduce Citi's ongoing FileNet-IBM [Enterprise Content Management ("ECM")] maintenance."  DX 32, at 87833.  The next day, Hinds also sent Ford an e-mail summarizing the steps Hinds would undertake if Hindsight was engaged.

DX 30.  There were four steps, all of which pertained to deactivating maintenance and none of which referred to "software license savings."  DX 30; Tr. 848-49.

18.  The proposed work order stated that "Hindsight's compensation is based on 30% of Citi's actual 24-month savings, even though Citi should continue to recognize benefits beyond 24 months."  DX 32, at 87833; Tr. 852-53.  The proposed work order contained a "24 month savings example" that was based on proposed reductions in "maintenance."  DX 32, at 87834.  The proposed work order did not provide for compensation based on software savings or FileNet users.  DX 32.

19.  On June 16, 2008, Citi provided Hindsight with a new draft agreement and work order providing that Hindsight would analyze "current software licensing structure, annual maintenance, systems deployments and contracts for FileNet across CitiMortgage and CitiBank North America businesses."  DX 38, at 105708.  The June 16 draft stated that Hindsight would "provide a new licensing structure that will reduce the overall maintenance costs incurred by Client.  The structure will also provide Client with a consistent licensing structure for all US entities and allow Client to utilize any licenses across all Client business entities."  DX 38, at 105708.  The June 16 draft stated that Hindsight's project fee would be "a fixed rate of

9

30% of the actual savings off current billed maintenance recognized by Client for a two year period." DX 38, at 105709; Tr. 856-58.

20.   On June 17, 2008, Hindsight agreed to the June 16 draft agreement and work order subject to edits it supplied.  DX 40.  Hindsight's June 17 edits did not change the "services and deliverables" section's requirement that Hindsight would provide a strategy to "reduce the overall maintenance costs."  DX 40. The edited work order made clear that the new structure would allow affiliates to use any unused active licenses across the business enterprise provided that their total usage would not exceed the authorized usage and that they would adhere to the Guidelines in the IBM-FileNet license.  DX 40, at 105739. Hindsight's June 17 edits did not change the "project fee" section's provision that Hindsight's compensation would be based on a "fixed rate of 30% of the actual savings off current billed maintenance recognized by Client for a two year period."  DX 40.

**III. IN JUNE AND JULY 2008, IBM PROPOSED A FILENET UPGRADE THAT CITI ULTIMATELY DID NOT ACCEPT**

21.   In June and July 2008, during the course of Hindsight's no cost or obligation analysis, Citi was evaluating a proposal received directly from IBM that would provide

10

software and hardware upgrades to a new version of FileNet called "P8" (the "IBM Proposal"). PTX 7.

22. The IBM Proposal anticipated a roll-out of a new FileNet platform, and additional expenditures associated with the purchase of new licenses and hardware. If executed, the IBM Proposal would also provide a reduction in ongoing annual maintenance. PTX 7; Tr. 517-18. Citi was interested in the IBM Proposal because it offered a new, more stable, document platform. Tr. 540-41, 551-52, 680-81.

23. Scheibelhut, in particular, was in favor of proceeding with the IBM Proposal because it would have provided a more stable platform and it was the product in which IBM intended to invest more in the future. Tr. 680-81. However, ultimately, Citi decided not to implement the upgrade to FileNet P8 outlined in the IBM Proposal because Citi did not want to incur the required approximately $2 million capital expense. Tr. 562, 690-91, 776.

**IV. HINDSIGHT'S EFFORTS TO OBTAIN AN AGREEMENT WITH CITI IN SUMMER 2008**

24. By July 2008, Hindsight had used the data Citi had provided to do its no cost, no obligation analysis. On July 9, 2008, Ford circulated internally at Citi a summary of the maintenance savings achievable through Hindsight's proposal (the

11

"July 9 Summary").  PTX 7.  In his July 9 Summary, Ford projected that Hindsight could save Citi over $600,000 per year on maintenance.  PTX 7.  Based on that maintenance savings, Ford's July 9 Summary stated that Hindsight's compensation would be a percentage of that maintenance savings in the amount of approximately $270,801.36.  PTX 7.

25.  As part of the July 9 Summary, Ford prepared a spreadsheet that analyzed the IBM Proposal and compared the costs and benefits of the IBM Proposal to retaining Hindsight. PTX 7.  Ford's spreadsheet, consistent with his discussions with Hinds and with Hindsight's proposal, provided for compensation to Hindsight based only on maintenance savings.  The July 9 Summary did not provide for any compensation to Hindsight in the event that Citi did not accept the IBM Proposal.  PTX 7; Tr. 863-64.

26.  By late July, although Ford was plainly in favor of the Hindsight proposal, he could not get the necessary Citi approval to enter into a contract with Hindsight and did not have authority to do so.  Tr. 851-52, 858.  On July 21, 2008, Ford informed Hindsight that he considered the Hindsight "deal to be dead."  Tr. 858-59; DX 50.

27.  Hindsight asked if the engagement could be processed through a different vendor that had already been approved.  DX

12

50.  Ford rejected that suggestion saying that "changing the players to get the same deal through would only antagonize" those who needed to approve Hindsight's retention.  DX 50; Tr. 351.

28.  After Ford advised Hindsight that the deal was "dead", Hinds's then-fiancé, Eden Williams, contacted Raymond McGuire, Citi's co-head of global investment banking.  DX 52.  Williams, a personal friend of McGuire, asked McGuire to help get senior level individuals at Citi to review Hindsight's proposal. Tr. 352-53; DX 52. McGuire passed on Williams' inquiry to a colleague who, in turn, sent the inquiry to Mark Torkos, a Citi managing director and chief information officer for consumer operations and technology.  DX 60.

29.  Meanwhile, on July 24, 2008, unbeknownst to Ford, Hinds altered the July 9 Summary, which Ford had provided to Hinds, to include a payment to Hindsight for money that Citi would save if Citi determined not to proceed with the IBM Proposal.  PTX 8; Tr. 86-88, 364.  The July 9 Summary that Ford had provided to Torkos related only to payment to Hindsight based on projected maintenance savings and did not contain any compensation related to not proceeding with the IBM proposal. PTX 7.  Ford's July 9 Summary and spreadsheet were consistent with all his discussions with Hinds.  Tr. 857-58.  Hinds sent a

13

new spreadsheet to Torkos.  In the e-mail, Hinds claimed that
"everyone within Citi who has reviewed Hindsight's proposal
believes moving forward is in Citi's best interest. . . . Jim
Ford forwarded to your attention on July 9, 2008 for your
approval."  PTX 8.  It was plainly not true that everyone within
Citi who had reviewed Hindsight's proposal was in favor of it.
Moreover, the attached proposal had been altered from the July 9
proposal that Ford had sent to Torkos because the new proposal
included a payment to Hindsight for not proceeding with the IBM
proposal.  Finally, Hinds's July 24 e-mail to Torkos included an
inaccurate description of Hindsight.  It described Hindsight as
a company made up of former "Filenet compliance executives,"
when in fact Hinds was Hindsight's only employee.  PTX 8.  This
was similar to a false statement that Hinds had made in his
original new vendor questionnaire that he completed for Citi in
May 2008, and provided to Ford in July 2008, in which Hinds
represented that Hindsight had five employees.  Tr. 312-13.  The
representation was false because Hindsight had only one employee
– Hinds.    Tr. 312-13.

30.  The changes Hinds made to Ford's spreadsheet which
Hinds sent to Torkos were material.  Hinds added payments of
over $300,000 by Citi to Hindsight if Citi were to decide not to
pursue the IBM proposal.  PTX 8; Tr. 89.  There is no evidence

14

that Hinds shared the spreadsheet he sent to Torkos with Ford or any other Citi employee.  Tr. 369, 864.

31.  Hinds's trial testimony that he only "tweaked" the numbers in Ford's spreadsheet was inaccurate because he added a payment for Hindsight for alleged savings if Citi did not proceed with the IBM proposal.  Tr. 87-88, 360-64, 369, 374-75.

32.  Ford testified that all discussions with Hinds were about maintenance savings and there was never a discussion about compensation based on users, deployments, or software savings. Tr. 852-53, 863.  Ford further testified that he never agreed to, and never discussed, compensation to Hindsight based on Citi's not proceeding with the IBM Proposal.  Tr. 864.

33.  Hindsight was never hired to do any consulting work with regard to the IBM Proposal and Hindsight's work was separate and unrelated to the IBM Proposal.  Tr. 604, 861.  In fact, Hinds never explained to Citi that he was seeking to be paid for Citi's foregoing the IBM proposal.  Tr. 691.  And, Citi never discussed paying Hindsight for the IBM proposal that was not accepted.  Tr. 864.  Citi's decision not to upgrade FileNet as outlined in the IBM Proposal pre-dated by many months the execution of the agreement between Hindsight and Citi and was unrelated to any work Hindsight did.  Tr. 604, 690-91.

15

## V. THE FALL 2008 NEGOTIATIONS

34.   In July 2008, Citi informed Hindsight that Harold
Hatter and Gil Scheibelhut would be handling future discussions
with Hindsight. PTX 9; Tr. 90.

35.   In August 2008, Scheibelhut was of the view that
Hindsight was not CitiMortgage's best available option.
Tr. 540.  Scheibelhut believed that the P8 platform being
proposed by IBM would be more stable than the current FileNet
platform.  Tr. 540-41.  Scheibelhut informed Hinds that Citi was
"not interested in doing business with him."  DX 75.
Scheibelhut wanted to pursue the IBM proposal and was
uncomfortable with bringing a third party into a partnership
Citi had with IBM.  Tr. 688.  In September 2008, Citi attempted
to come up with the same savings claimed by Hindsight, but was
unable to do so.  PTX 61; PTX 67.

36.   Due to financial constraints, Citi decided not to
proceed with the IBM Proposal.  Tr. 690.  Meanwhile, Hinds went
directly to Mark Torkos and argued that his proposal had merit
and that Scheibelhut and Hatter were not "familiar with (or have
[not] even reviewed) the facts" of his recommendations.   DX 75.
Citi decided to allow Hindsight to make its proposal for
maintenance savings, which would create no obligation on Citi's
part to proceed with a proposal.  Tr. 691.  In October 2008,

16

negotiations between Hindsight and CitiMortgage resumed.

Tr. 91; PTX 10; DX 99.

37.  On October 17, 2008, Citi provided Hindsight a draft
master professional services agreement and work order.  PTX 10.
The October 17 draft followed the June 16-17, 2008 drafts that
Hindsight had accepted with minor changes.  DX 38; DX 40.  The
October 17 draft provided that Hindsight would analyze the
current information and data provided by Citi for software
licensing and maintenance arrangements with FileNet. PTX 10.
Upon completion of the review, Hindsight would provide

> a proposal to [CitiMortgage] outlining the strategy for
> reducing the overall annual FileNet maintenance costs. Such
> a proposal must provide for the savings set forth herein
> without any reduction or negative impact, in any way, on
> the maintenance services currently being obtained by
> [CitiMortgage]. Without limiting the foregoing, any
> proposal will also allow [CitiMortgage] to authorize
> business affiliate[s] the right to use any unused active
> licenses across [CitiMortgage's] business enterprise, so
> long as the actual usage does not exceed the authorized
> usage and the affiliates adhere to the guidelines.

PTX 10, at 98880.  The October 17 draft based all compensation
to Hindsight, if any, solely on "maintenance" savings. PTX 10,
at 98881; Tr. 101.  Compensation was to be based on 30% of the
actual savings recognized by CitiMortgage on the annual
maintenance costs for a two year period compared with
IBM/FileNet's most recent annual maintenance quotes, namely

17

annual maintenance quotes of $1,579,374.05 for CitiMortgage and
$155,735 for Citibank.  PTX 10, at 98881.

38.  Hinds edited the October 17 draft in an October 20,
2008 draft he e-mailed to Citi.  PTX 11.  Hindsight revised the
"project fee" section to provide that payment would be "30% of
the actual software license savings and off current billed
maintenance anticipated by Client for a two-year period."  PTX
11, at 99675; Tr. 99-101, 103-04, 394-95, 580.  Hinds took out
the previous maintenance quotes that were in the prior draft.
Hinds testified that the "software license savings" he inserted
related to the IBM Proposal.  Tr. 395.  Hinds testified that he
had not added the software license savings language in previous
drafts because Citi had not "provided . . . the IBM proposal [to
Hindsight] . . . until June 18."  Tr. 336-37, 339-40.

39.  On October 22, 2008, Michele Askins, a Citi employee
involved with vendor procurement, Tr. 567, e-mailed Hinds
stating that Hindsight's October 20 edits did "not reflect
earlier discussions on certain items, including but not limited
to the acceptance and payment terms."  DX 103.

40.  A call took place on October 24, 2008 between Hinds,
Scheibelhut, Hatter, and Askins.  At trial, Hinds testified in
detail about the call; he testified that Scheibelhut told him to
include the $2 million IBM proposal as a baseline from which to

18

determine software savings.  Tr. 105-06. However, when asked at his deposition about "what was discussed on [the October 24, 2008] call," Hinds testified: "I don't recall at this time." Tr. 283-84.  Scheibelhut testified that although he could not recall specific calls, he recalled always rejecting Hindsight's proposed "software savings" language.   Tr. 593-96, 599, 695. Hinds's testimony that he now recalls Scheibelhut telling him to put in savings based on the IBM proposal is not credible. Scheibelhut had opposed the Hindsight proposal and went forward with it on the basis of no-risk maintenance savings from currently-billed maintenance from IBM.  It is not credible that Scheibelhut would have offered to compensate Hindsight for an IBM proposal that Citi had rejected because Citi was not prepared to pay the cost of the IBM proposal.

41.  There are no notes or correspondence reflecting the October 24 call with the exception of a contemporaneous e-mail from Hatter to Scheibelhut in which Hatter asks: "Do you want to mention[] the reduced license scenario."  PTX 95.  No one testified to knowing what this e-mail referred to, and any attempt to reconstruct its meaning would be sheer speculation at this time.  Tr. 590-91, 928-30.  It certainly does not reflect any suggestion that Citi would be prepared to pay Hindsight for software savings and it does not suggest, as Hindsight argues,

that Citi was attempting to formulate any misrepresentations to Hinds.

42.  On October 27, 2008, Hinds e-mailed Citi and stated that "[p]er Friday's discussion, now that we understand Citi's intention is to complete the process and submit Hindsight Solutions['s] recommendations to IBM (after being accepted), I did not feel the need to include Hindsight's previously amended version."  PTX 13.  Hinds stated that he "reverted back to the original document version crafted by Citi, including the suggested changes we discussed on Friday (The majority of Citi's language was kept in place)."  PTX 13.

43.  Notwithstanding Hinds's statement that he reverted back to the original document version created by Citi, the Hindsight October 27 draft included language such that compensation would be based on "software license savings or a minimum of a 20% annual reduction of Client's annual FileNet maintenance."  PTX 13, at 100723; Tr. 108.  In the October 27 draft, Hinds added a new section on "Confidentiality Restrictions" that restricted Citi's ability to share Hindsight's services or deliverables within Citi.  PTX 13, at 100723.

44.  The October 27 draft also stated that "[s]avings will be based on a comparison of any new pricing against the most

recent software license quote of $2,014,807 for CitiMortgage and annual maintenance quotes from IBM/FileNet showing annual costs of $1,579,374.05 for CitiMortgage and $155,755.14 for Citibank." PTX 13, at 100723.  $2,014,807 was the amount Hindsight associated with what would have been Citi's capital expenditure if it accepted the IBM proposal for a new FileNet system.  Tr. 111.  Hinds testified that $2,014,807 would be the minimum save from which Hindsight would be compensated.  Tr. 111-12. However, the proposed language was simply a comparison of any software savings from the IBM software quote of over $2 million.

## VI. THE NOVEMBER 7, 2008 TELEPHONE CALL

45.  On November 5, 2008, Michele Askins provided edits to the October 27 draft which, among other things, struck the "software license savings" and "software license quote of $2,014,807" from Hindsight's draft.  PTX 14, at 102429.  The November 5 draft struck the paragraph on confidentiality Hinds had inserted and added language from Citi's legal department pertaining to Citi's ability to use the Deliverables as it saw fit.  PTX 14, at 102428; Tr. 403-04.

46.  On November 7, 2008, Scheibelhut, Hatter, and Askins had a telephone call with Hinds to discuss Citi's November 5 draft.  Tr. 116, 694-95.  Scheibelhut testified that the parties discussed Citi's decision to strike the software savings

21

language from Hindsight's October 27 draft.  Tr. 695.

Scheibelhut testified credibly that he told Hinds "that I needed

this deal to be just about maintenance. . . . I wanted this one

to be only about maintenance, because that's always been my

understanding."  Tr. 695.

    47.  In the Amended Complaint, the plaintiff alleged that

on the November 7 telephone call, in order to convince Hinds to

remove the "software savings" language, Scheibelhut stated:

"Citi Corporate has mandated an immediate software deployment

freeze across all of Citi worldwide for an indefinite period to

reduce cost. . . . Citi will not be deploying any new users

within the [two year] period covered by this Work Order."  Am.

Compl. ¶ 27.  There is no credible testimony or credible

contemporaneous documents to support that allegation.

Scheibelhut specifically denied ever making a representation

about a deployment freeze, software freeze, or any other freeze.

Tr. 611-12, 698-700. Scheibelhut also denied guaranteeing

anything on the November 7 call or agreeing to revisit software

savings at a latter point in time.  Tr. 699-700.  Hatter

similarly testified that he had not heard the word "deployment

freeze" on a call with Hinds, nor did he provide any assurance

of a deployment freeze.  Tr. 915-16.  In fact, neither

Scheibelhut nor Hatter had heard the term "deployment freeze"

used at Citi.  Tr. 672, 916.  The testimony by Scheibelhut and
Hatter was credible.  The Citi drafts had always based
compensation on maintenance savings from the current maintenance
payments that Citi was required to pay IBM.  Up until Hinds
received the IBM proposal from Ford, the Hindsight drafts also
based compensation on maintenance savings.  And it made no sense
for Scheibelhut to agree to pay Hinds for savings on an IBM
proposal that had already been rejected by Citi.  Moreover, the
testimony from Scheibelhut and Hatter that they had not heard of
a "software deployment freeze" was wholly credible because it is
unclear exactly what such a term would have meant.  As
Scheibelhut testified: "But, it's such an odd thing to, you
know, describe a deployment freeze.  We just don't stop
deploying software to users."  Tr. 612.  While the Amended
Complaint alleged that the defendants "guaranteed Plaintiff that
they were not going to initiate any new deployments within the
relevant contract period," Am. Compl. ¶ 27, Hinds denied in his
testimony that there was any guarantee.  Tr. 411-12.

48.  While Scheibelhut was on the November 7 call with
Hinds, he sent an e-mail to his boss, Scott Pankoff, describing
the negotiations with Hinds.  PTX 73.  In his e-mail,
Scheibelhut stated that he was "concerned about some of the
statements [Hinds] put in saying that we can't share the

proposal internally within Citi without his consent."  PTX 73.
This is consistent with the discussion of the confidentiality
clause that Citi had revised.  In his e-mail, Scheibelhut also
stated that "[Hinds] also is still debating compensation if we
reject the proposal, but I think I just got him past that."  PTX
73.  This comment is also understandable because an earlier
draft of the proposed agreement from Hindsight had included a
provision in the Acceptance Criteria of the Work Order that
would have provided that CitiMortgage would be required to pay
Hindsight the reasonable value of Hindsight's services if,
through no fault of Hindsight, CitiMortgage prematurely
terminated the Work Order.  PTX 13, at 100723; Tr. 157.  This
clause was deleted from the Agreement that eventually was
signed.  PTX 18.

49.  During the call, Scheibelhut also sent an instant
message to Greg Crane, a Citi senior manager overseeing FileNet,
Tr. 767-68, in which Scheibelhut stated: "I'm negotiating with
Michael Hinds right now on the payment" and that Hinds was
"counteroffering the payment schedule to be 3 payments next
year.  We put in the contract that we would pay him quarterly as
we pay IBM."  PTX 74.  The final agreement provided that Hinds
would in fact be paid in three quarterly payments.  PTX 18, at
28.

50.   Hinds testified that Scheibelhut asked him to strike the software savings language "because they had a mandated worldwide software deployment freeze that had gone into effect . . . ." Tr. 154-55. But that testimony was not credible. It was not reflected in the contemporaneous documents and was not included in any representations and warranties in the final agreement despite its alleged importance to Hinds. As explained by Scheibelhut, it is unclear what the alleged representation was supposed to mean. Hinds is not helped by his testimony on cross-examination that the IBM Proposal was specifically discussed during the November 7 call. Tr. 415-17. Hinds testified that Citi asked that the reference to the IBM Proposal savings be removed because Citi was not going forward with the IBM Proposal. Tr. 415. On direct examination, Hinds did not testify that such a statement was made in the November 7 call and it was not referred to in the Amended Complaint. In any event, it is not helpful to Hinds because it suggests that Citi explained to Hinds that it was not proceeding with the IBM proposal which, on its face, would be a perfectly reasonable explanation for why Citi would not pay Hinds a share of savings that Citi experienced from not going forward with the IBM proposal. Citi had not yet entered into an agreement with Hinds, other than the no-cost, no-risk assessment, and the IBM

25

proposal was already dead because Citi was unwilling to pay for it.  There was no basis to pay Hindsight for the fact that Citi did not proceed with the IBM proposal.

51.  On November 10, 2008, the next business day after the November 7, 2008 call, Hinds confirmed via e-mail the parties' understanding of the payment obligations.  DX 109.  DX 109 was the only e-mail that Hinds sent concerning the November 7, 2008 call.  Tr. 423.

52.  In his November 10, 2008 e-mail, Hinds confirmed that Hindsight's estimated fees would be $753,375, which was "a fixed rate of 30% of [CitiMortgage's] actual savings, recognized by [CitiMortgage] over a twenty-four month period ($2,511,250)" and that payment would be made in "3 equal payments to Hindsight Solutions distributed in Q1, Q2, & Q3 2009."  DX 109.

53.  None of the contemporaneous e-mails (PTX 73), the instant message (PTX 74), or the November 10, 2008 e-mail memorializing the parties' understanding of the payment obligations (DX 109) make any mention of software savings, the deployment freeze, revisiting compensation or of other representations extraneous to the proposed agreement.

54.  Hindsight relies on PTX 16, Hinds's purported notes of the November 7, 2008 call.  PTX 16 consists of notes that were not taken while Hinds participated on the November 7 call but

26

were, according to Hinds, "consolidated" from other notes after
the call.  Tr. 119-20.  Hinds testified that he had two sets of
notes during the November 7 call: a set with questions and a
different notepad on which he wrote statements made on the call.
Tr. 157-58.  After the call, Hinds testified that he
"consolidated" the notes into a single set of notes.  Tr. 120,
165.  The original notes from which the consolidated notes were
created have never been produced.  Tr. 125-26.  Hinds testified
that he scanned the consolidated notes into a PDF file on a
computer and PX 16 was printed from this PDF file.  Tr. 126-27.
Hinds did not have the original of the document that was scanned
into the computer and did not have the PDF file from the
computer.  All that remains is what was printed out from the
computer.  Tr. 127-28, 135-36.  Even though Hinds testified that
he frequently takes notes, Hinds produced no other notes.  Hinds
testified that he "was not in possession, custody or control" of
other notes.  Tr. 143.

55.  PTX 16 makes no specific reference to the IBM Proposal
or the $2 million savings under the IBM Proposal.  Nor do the
notes refer to a "true-up," "look back" or "validation phase" at
the end of 24 months.  PTX 16 makes no reference to revisiting
software savings compensation if new users are added, although

Hinds testified that was discussed during the call.  Tr. 408;
PTX 16.

     56.   Hinds testified that he wrote the Citi responses to
his questions while the telephone call was in progress and then
simply combined those responses with the questions into his
consolidated notes that are allegedly PTX 16.  Tr. 160-63.
However, many of the responses on the document do not reflect
Citi responses to questions but rather Hinds's alleged
interpretation of what Citi agreed to on the call.  Hence,
PTX 16 includes comments such as "Gil/Harold - Both assured HS
that Citi only intends to use the information/data in
negotiations to reduce cost and have no[] intent to disclose any
info that would cause harm to HS.  HS response: Based on Gil's
response HS agreed to allow Citi suggested changes to the W.O.
language."  PTX 16.  Another note says: "HS Response: Based on
Gil's reasoning, HS agreed to Citi's request to remove the S/W
savings language from this W.O."  PTX 16.  On their face, these
are not contemporaneous notes, but rather reflections on what
Hinds says occurred in the phone call made at some time which,
because of the absence of all of the original notes and the PDF,
cannot reasonably be dated.

57.  The Original Complaint alleged that the misrepresentations occurred in October 2008 and did not mention a November 7 call.

58.  At trial, Defendants objected to the introduction into evidence of the notes on the grounds that they are hearsay.  The Court reserved decision on admissibility.  The Court now finds that PTX 16 is inadmissible.  The document is hearsay because it is the out of court statement by Hinds as to what was said on the November 7 call.  The document does not qualify for the business records exception under Fed. R. Ev. 803(6) because there is an insufficient showing that it was actually made at or near November 7, and that it was made in the regular course of business.  Moreover, the circumstances of the preparation of the documentation indicate a lack of trustworthiness.  See, e.g., United States v. Strother, 49 F.3d 869, 876 (2d Cir. 1995) (affirming exclusion of business records that were shown not to be made contemporaneously and were therefore not trustworthy); Johnson v. Strive E. Harlem Employment Grp., 990 F. Supp. 2d 435, 453 (S.D.N.Y. 2014) (declining to admit as business records notes originating from the defendant's investigation after a complaint by the plaintiff in part because they lacked trustworthiness).  In any event, the Court has plainly

considered PX 16 with care and it does not change any of the
findings of fact or conclusions of law.

### VII. THE AGREEMENT

59.  The Master Services Agreement and attached Work Order
(the "Agreement") was signed by Hindsight on December 31, 2008
and by CitiMortgage on January 6, 2009.  The Agreement was
effective as of December 15, 2008.  PTX 18.

60.  No draft of the agreement contained language in the
project fee section concerning a payment to Hindsight based on
"deployments" or the number of FileNet users.  Tr. 397, 413-14;
DX 99; PTX 11; DX 246; DX 106.  The most recent Hindsight
proposal that was rejected by Citi provided that Citi would pay
any savings "based on a comparison of any new pricing against
the most recent software license quote of $2,014,807 for
CitiMortgage," which was the IBM quote for its proposal that
Citi had rejected.  DX 246, at 100723.  This was in addition to
the maintenance savings that could be measured by comparing the
maintenance actually paid by Citi to the last maintenance quotes
from IBM.

61.  Pursuant to the Agreement, Hindsight would provide
CitiMortgage with a proposal to reduce annual FileNet
maintenance costs.  DX 129.  Hindsight agreed to "analyze, as
provided by [CitiMortgage] in [CitiMortgage's] sole and absolute

discretion, information and data concerning software licensing and maintenance arrangements with FileNet for any and all [CitiMortgage] businesses, as determined by [CitiMortgage] in its sole discretion ([sic] including but not limited to any Affiliates of [CitiMortgage]." DX 129, at 27.

62. The Agreement requires that Hindsight, in analyzing Citi's system metrics and making a proposal, would ensure CitiMortgage's savings "without any reduction or negative impact, in any way, on the maintenance services or license rights currently being obtained by [CitiMortgage]." DX 129, at 27.

63. The Agreement provides that: "Without limiting the foregoing, any proposal will also not restrict [CitiMortgage's] current rights to authorize business affiliates the right to use any unused active licenses across [CitiMortgage's] business enterprise, so long as the actual usage does not exceed the authorized usage and the affiliates adhere to the guidelines." DX 129, at 27. Hindsight's work under the Agreement did not create new rights for Citi under the IBM-FileNet Contract that it did not already have. Tr. 588-89. The Agreement provides that Hindsight would, "at [CitiMortgage's] sole discretion and upon [CitiMortgage's] specific request, join [CitiMortgage] in any meeting with IBM." DX 129 at 27-28.

64.   Pursuant to the Agreement, Hindsight would not be paid
unless its proposal resulted in "a minimum of a 20% annual
reduction of [CitiMortgage's] annual FileNet maintenance."  DX
129, at 28.  If Hindsight's proposal was accepted by IBM, then
the savings would be "based on a comparison of any new pricing
against the most recent annual maintenance quotes from
IBM/FileNet."  DX 129, at 28; Tr. 702-03.

65.   The Agreement provided:

> [Hindsight] will perform all Services and provide all
> Deliverables under this Work Order for a fixed rate of
> 30% of the actual savings, to be recognized by
> [CitiMortgage] for a two year period, off the stated
> annual maintenance costs currently billed to
> [CitiMortgage] as long as the savings exceed 20% of the
> annual maintenance costs. In the event such savings do
> not exceed 20 percent, then no fee of any kind shall be
> due to [Hindsight].

DX 129, at 28.

66.   Under the Agreement's payment schedule, Hindsight
could invoice CitiMortgage once CitiMortgage notified Hindsight
that Citi had "realized the full savings (as outlined on
IBM-FileNet updated invoice), on an annual basis, set forth
herein."  DX 129, at 28.  If those savings were 20% or greater,
CitiMortgage would then owe Hindsight, under this schedule, the
"total fee" in "3 equal payments" "payable in Q1 2009, Q2 2009,
and Q3 2009."  DX 129, at 28.

32

67.   The Agreement did not contain a "look back" or a "true up" provision with respect to Hindsight's fees after 24 months, nor did the parties ever agree to such a provision.  DX 129; Tr. 702-03.  Hinds testified that the Agreement and his "interpretation" of the words "actual savings" in the work order covers all savings Citi recognized through Hindsight's work, including so-called software savings and audit defense work. Tr. 170-74, 200-04, 214, 492-95.  But that is not a reasonable or credible interpretation of the Agreement and the negotiating history.  The Agreement did not provide that the scope of work would include software savings.  Rather, the Agreement provided that Hindsight would provide a proposal outlining a strategy "for reducing the overall annual FileNet maintenance costs."  DX 129, at 27.  And the payment structure was to be based on the savings on maintenance costs, not software savings or audit savings, although the Agreement did contain the provision that Hindsight would participate in meetings with IBM as requested by Citi.

68.   Similar to prior drafts and Hindsight's own Standard Terms and Conditions, the Agreement contained a merger clause. The clause provided:

> This Agreement (together with the appendices attached
> hereto or incorporated by reference herein) constitutes the
> complete understanding of the Parties, and supersedes all

> prior or contemporaneous agreements, discussions,
> negotiations, promises, proposals, representations, and
> understandings (whether written or oral) between the
> Parties, with regard to the subject matter hereof.
> [Hindsight] specifically acknowledges that it did not enter
> into this Agreement in reliance upon any agreement,
> promise, representation, or understanding made by or on
> behalf of [CitiMortgage] that is not contained herein.

DX 129, at 22.

69.  The Agreement contained a disclaimer: "EXCEPT FOR THE
REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS
AGREEMENT OR ESTABLISHED BY APPLICABLE LAW AS RIGHTS THAT CANNOT
BE WAIVED OR LIMITED BY CONTRACT, EACH PARTY DISCLAIMS ALL
REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTY
OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."  DX
129, at 12 (emphasis in original).

70.  The Agreement contains nine separate Representations
and Warranties by the parties, none of which includes a
representation of a software deployment freeze or a user freeze.
DX 129, at 10-12.  The Agreement further provides that: "[t]he
terms, conditions, covenants and other provisions of this
Agreement may be modified, amended, supplemented or otherwise
changed only by a written instrument . . . ."  DX 129, at 21.

34

### VIII. HINDSIGHT PROVIDES CITIMORTGAGE WITH ITS DELIVERABLES

71.  On January 9, three days after Citi had signed the Agreement, Hindsight provided Citi the first of its Deliverables under the Agreement.  DX 136.

72.  The total of Hindsight's Deliverables consisted of a project summary and two draft letters for CitiMortgage to send to IBM requesting that the maintenance on certain licenses owned by Citi be deactivated.  DX 131; DX 136; DX 150.

73.  As part of its analysis under the Agreement, Hindsight concluded that Citi was "over-licensed."  Tr. 449-50, 856, 865-66; DX 136; DX 140.  Because Citi was over-licensed, the addition of any new users during the relevant time period did not require the purchase of additional FileNet licenses from IBM.  Tr. 787.

74.  The "High Level Project Engagement Summary" provided a process overview and a review of Hindsight's findings based on a determination of actual usage and deployment derived from a review of, among other things, Citi's FileNet system monitoring built in tools completed in January 2009.  DX 136.  The draft letters to IBM provided that the changes were being requested "[d]ue to employee reductions and changes in how CitiMortgage REL and Citi Affiliate's [sic] interact with the software products associated with System ID: 107272," and that the

35

request to "deactivate maintenance" was being made "in an effort to more accurately reflect Citi's actual use and deployment." DX 150, at 272.

75. In addition to the list of items on which maintenance was to be discontinued, Hindsight's proposed letter to IBM contained a summary of Citi's ongoing usage noting that "effective February 2009, Citi REL, CBNA and Citi affiliate's [sic] will be authorized to access the Combined REL Imaging System Repository – System ID: 107272." DX 150, at 276. A similar chart was prepared for the state of the licenses effective October 1, 2009. DX 150, at 277. IBM did not accept these assertions in the Deliverables while it did agree to discontinue the maintenance as requested. DX 163; Tr. 459.

76. Nothing in the Deliverables recommended or effected an amendment or any change to the terms of the IBM/FileNet contract with Citi. Tr. 286-87. The draft letters reflected a total maintenance savings of $1,204,867.71 per year to be recognized over two years for a total of $2,409,735.42 in maintenance savings. DX 150; DX 160.

77. Based on Hindsight's analysis, Citi was "over-licensed" and could safely deactivate maintenance on some items without compromising functionality on the FileNet system. Tr. 284-85; DX 136.

78.   Throughout negotiations, Hindsight had projected that based on its recommendations CitiMortgage could save from approximately $1,116,774 to $2,511,250 over two years in annual maintenance.  DX 17; DX 109.  Hindsight projected that, based upon configuring the IBM maintenance quote covering 24 months, its total fee would be approximately $335,032 to $753,375. DX 17; DX 109.

79.   In or about March 2009, IBM accepted the deactivations outlined in the Citi letter that Hindsight had drafted, although IBM did not accept the analysis of how the licenses could be used across various Citi businesses.  DX 163; Tr. 200-01, 787-89.

80.   The Deliverables provided for Citi to deactivate FileNet maintenance in two steps.  DX 150.  Following IBM's acceptance of the proposal, Citi would deactivate maintenance on some FileNet licenses, leaving Citi paying maintenance on licenses that authorized 32,020 internal users and 2 million external users.  DX 150, at 273, 276.  The second phase of deactivations would then take place on October 1, 2009. Pursuant to the Deliverables, CitiMortgage would deactivate maintenance on licenses for 1.5 million external users and over 20,000 internal FileNet users.  DX 150, at 273. By October 1, 2009, CitiMortgage would be left paying for maintenance on

licenses for 500,000 external users and 12,020 internal users.
DX 150, at 277.

81.  In January 2009, when Hindsight provided its
Deliverables, CitiMortgage had approximately 10,000 internal
FileNet users.  DX 156.  By September 2009, Citi had about
13,500 internal FileNet users.  PTX 91.

82.  Accordingly, had CitiMortgage not deactivated any
licenses at Hindsight's Recommendation, or had it only done the
first set of deactivations, CitiMortgage could have added over
20,000 new internal users to FileNet under licenses it owned
before Hindsight was retained.  DX 150; PTX 91; PTX 97.

**IX. HINDS'S KNOWLEDGE OF NEW USERS IN FEBRUARY 2009 AND
INVOICING OF CITI**

83.  After Hindsight provided its Deliverables to Citi in
January 2009, Hinds became aware that Citi was adding additional
FileNet users.  However, until October 2009, there is no
credible evidence and no document reflecting that Hinds ever
protested that the addition of new users was inconsistent with
any representation to him that there was a "user freeze" or that
no new users would be added to the FileNet user base.  The first
such document, discussed in greater detail below, was sent by
Hinds in October 2009 after Hinds had been unsuccessful in
obtaining other business from Citi.  The lack of any protests

prior to that point is strong evidence that no such
representation was made to Hinds and that his current testimony
about the existence of such a representation is not credible.

84. During February 2009, prior to completing the
maintenance deactivation process, Hinds was made aware that Citi
had plans to add an additional 9,100 users to the FileNet
system. DX 147; DX 249. At the same time, Hinds was using the
"full user report" system metrics. DX 156. That full user
report showed that users had been added to the FileNet system in
2008, while the Agreement was being negotiated and after the
November 7 call. Tr. 792-94. Hinds did not claim that he had
been deceived or indicate that he had been told there was a
"software deployment freeze." Tr. 469-71.

85. By e-mail to Ford dated February 23, 2009, Hinds
acknowledged there were new users being added to FileNet. DX
249. Ford testified that he and Hinds had only discussed
compensation based on maintenance, and nothing else. Tr. 863-
64.

86. At the same time that Hinds used the full user report
in February 2009 and knew about new users being added to the
FileNet system, CitiMortgage and Hindsight exchanged
calculations of CitiMortgage's 24 month savings and Hindsight's
project fee under the Agreement. The parties did so by

comparing the new IBM-FileNet maintenance quotes with the pre-existing IBM-FileNet maintenance quotes.  DX 159; DX 160; DX 161.

87.  Ultimately, Hinds and Citi together calculated a total savings of $2,365,636.06 and total compensation to Hindsight of $709,690.83.  DX 161.  Hinds submitted his three invoices in March 2009.  DX 179.  Citi paid the three invoices, paying the last invoice in August 2009.  PTX 25.  In his cover e-mail transmitting Hindsight's invoices, Hinds stated that he looked forward to the "opportunity of working together on future projects" and that he was "available to answer any question or concerns which may arise in the future conversations related to IBM."  DX 179.

**X. THE KPMG AUDIT**

88.  Hindsight has sought compensation for its assistance to Citi in connection with an audit performed by the accounting firm KPMG related to Citi's use of the FileNet software. Hindsight has been inconsistent as to the factual basis for its claimed compensation.  At times, it has argued that it was entitled to compensation for its assistance because these were services performed under the Agreement, and Citi had agreed to compensate it for "actual savings", which Hinds testified meant "all savings" including audit savings.  DX 129; Tr. 495.

Indeed, as discussed below, Hindsight ultimately sent an invoice to Citi in 2011 for work on the KPMG audit.  The invoice referenced the Agreement.  PTX 38.  This claim fails as a matter of fact because the Agreement was explicit that Hindsight was to be paid only for the maintenance savings determined by comparing the maintenance billed by IBM after the Hindsight work compared to the maintenance quotes before the Hindsight work.  At other times, Hinds testified that his work under the Agreement was completed with the submission of the Deliverables, and that the KPMG work was part of a separate engagement.  In support of this theory, he argues that Greg Crane "engaged" him in August 2009, after Hinds had completed his work under the Agreement.  Tr. 489-90, 492.  This argument also fails because it is plain that Greg Crane did not have the authority to hire Hindsight, and Hinds knew that because he was familiar with the contract review process having gone through it with respect to the Agreement. Crane testified credibly that he did not hire Hinds for the KPMG audit and did not have the authority to do so.  Tr. 794-97.

89.  In 2009, IBM, through KPMG, initiated a firm wide audit of Citi's use of all IBM products.  Tr. 833-34.  Although Ford recommended Hindsight to assist with the firm-wide audit, Hindsight was not hired for the assignment.  Tr. 474.

41

CitiMortgage's use of IBM/FileNet was part of that audit. Tr. 474-75.

90. Hinds testified that Hindsight was "officially" engaged for the audit on August 13, 2009 and the engagement lasted until August 24 or August 26, 2009. Tr. 502-03. There is no writing confirming an "official" engagement. Tr. 503. Crane, the CitiMortgage employee Hinds contends "officially" hired Hindsight for the audit, Tr. 503, testified credibly that he did not hire Hindsight for a new assignment. Tr. 796-97. He turned to Hinds because there were questions raised about issues related to the deactivation that Hinds had completed a few months before. Tr. 796-97. Indeed, when Hinds had sent his invoices to Crane on March 24, 2009, Hinds wrote that he "will be available to answer any questions or concerns which may arise in the future conversations related to IBM (I recommend we discuss Citi's responses related to FileNet-IBM prior to officially submitting any responses/signing contracts in the future)." DX 179. Crane did not have the authority to hire a vendor for Citi and did not initiate the process for entering into a new work order with Hindsight. Tr. 796-97. There was no contract and no new work order for the so-called audit defense work. Tr. 493.

91.   Under the Agreement, Hindsight's deactivation recommendations could not negatively impact the FileNet performance.  DX 129, at 27; Tr. 577.  The Agreement also required that Hindsight join Citi in any meetings with IBM at Citi's request.  DX 129, at 27-28.

92.   In May 2009, before Hinds claims to have been officially engaged, Crane asked Hindsight to assist him in answering certain of KPMG's questions that related to FileNet. Tr. 794-95, DX 187; DX 190.  Hinds requested that Citi "defer all comments regarding the Internal or External users to [Hinds]" and warned Crane not to get "trap[ped] into a conversation regarding the internal vs. external users."  DX 192.

93.   The audit work Hindsight did pertained to the same licenses and subject matter as the original deactivations under the Agreement.  DX 258, at 48356; DX 150; Tr. 800-01.  On August 13, 2009, Crane received a "draft for discussion purposes only" of KPMG "software license review" spreadsheet.  DX 206.  The spreadsheet attached to DX 206 included ten items of alleged over-deployment, including one relating to FileNet images services licenses. DX 206; Tr. 800-01.  Crane testified that the FileNet image services license listed on the KPMG spreadsheet

43

was the same image services license that Hindsight recommended
be deactivated in its Deliverables.  DX 206; DX 150; Tr. 800-01.

94.  On August 19, 2009, KPMG sent an updated version of
its spreadsheet to Citi, which Crane forwarded to Hinds.
DX 258.  The new KPMG spreadsheet reduced the number of FileNet
image service license over-deployments from 3,127 listed in
DX 206 to 1,123.  DX 258, at 48356.  Hinds later participated in
a call with Crane and KPMG.  Tr. 803-04.  On that call, the
parties discussed KPMG's preliminary assessment of a 1,123 image
service license over-deployment.  Tr. 803-04.  Crane testified
that the 1,123 image services licenses listed on the KPMG
spreadsheet related directly to the image services licenses
listed in the Hindsight Deliverables.  Tr. 803-04; DX 258, at
48356; DX 150.  That was the only call with KPMG in which Hinds
participated.  Tr. 803.  On the call, Hinds discussed the images
services license deployment that had been impacted by the
Deliverables, but did not assist in discussing any of the other
items.  Tr. 804-05.

95.  At most, Hinds had one telephone call with KPMG and
worked for 13 days on audit-related issues during his alleged
official engagement.  Tr. 502-03, 803.  Hinds has no notes of
any work performed, and no documentation of the time he claims

44

he spent.  Tr. 501.  Hinds never met or spoke with IBM during the course of his audit work.  Tr. 499.

96.  On August 24, 2009, Hinds sent an e-mail to Crane and Scheibelhut summarizing his work on the KPMG audit.  DX 212.  In that e-mail, Hinds only claimed to have helped reverse the 1,123 purported over-deployment of FileNet Image Services licenses. DX 212.  The 1,123 licenses were also described in a contemporaneous e-mail from KPMG as the "high priority" items discussed on the one call that Hinds joined.  DX 211.  The August 24 e-mail appears to have been sent at Scheibelhut's request and it is couched as a pitch for additional work for Hindsight.  Under "Next Steps", Hinds wrote:

> Citi engage Hindsight Solutions to conduct an 'Initial No Cost, No Risk Analysis' across all of Citi's IBM Software product platforms.  Goal will be to ensure the overall accuracy of KPMG's audit findings, as well as to ensure Citi does not get locked into overpay for upcoming IBM ELA, effective October 1, 2009.

DX 212.  Crane forwarded the substance of this e-mail to Scott Pankoff on September 9, 2009.  DX 213.  On September 9, 2009, Pankoff recommended to Mark Torkos that Hindsight was a potential helper to reduce software expense.  DX 213.  On the same date, Scheibelhut also recommended Hindsight to Pankoff for additional work "[o]utside of KPMG".  DX 213.

97.   The parties did not discuss additional compensation for Hindsight.  Tr. 796.  Crane understood he could discuss communications concerning the audit with Hinds under the Agreement because it allowed Citi to contact Hindsight with any questions concerning the analysis Hindsight provided on FileNet. Tr. 796-97.  Hinds also had informed Crane in March 2009 that he would "be available to answer any questions or concerns which may arise in the future conversations related to IBM."  DX 179. Hindsight had agreed to join Citi in any meetings with IBM.  DX 129, at 27-28.  Under the Agreement, Hindsight's deactivation recommendations could not negatively impact the FileNet performance.  DX 129, at 27.

98.  Hindsight admits that it did not request or enter any agreement or work order separate and apart from the original Agreement. Tr. 492-93.  Crane, the person Hinds claims hired him for the audit, testified credibly that he did not discuss compensation with Hinds and he had no expectation that Hinds would be paid for his work on the KPMG audit.  Crane testified credibly that there is a process for hiring vendors at Citi, and that Crane did not have the authority to hire anyone.  Tr. 794-96.  Having become familiar with the hiring process from his original retention for the Agreement, it is incredible for Hinds to maintain that he actually thought he was hired by Greg Crane

46

in a phone call for a contract Hinds now claims was worth millions of dollars.  There was no new contract for Hinds to do work on the KPMG audit and any work that he did was within the scope of the original Agreement for which he was paid based on the actual maintenance savings, as defined in the Agreement.

99.  Ford testified credibly that he and Crane had spoken to Hinds to make sure that he would defend his work because, if the audit found any irregularities, it would be because of Hinds's work, and Hinds said that he would defend his work at no additional cost.  Tr. 867-69, 890.

100. Hinds testified that the so-called "audit defense work" was performed under the Agreement because the "actual savings" language in the Agreement was "inclusive" of "any savings that are associated with an audit."  Tr. 495.

101. Throughout 2009 and 2010 Hindsight never invoiced Citi for any work done in connection with "audit defense." Tr. 501-02.  On December 21, 2010, Hinds sent an e-mail to Crane in which he contended that the "current contract" was nearing its initial 24-month contract term.  PTX 35, at 98165. Hinds contended that "substantial savings related to Hindsight's defense of Citi in connection with the KPMG FileNet audit in 2009" were part of the "current engagement" and part of the "'actual savings' over the initial 24-month term."  PTX 35.  The

e-mail referred to a "true-up" which did not in fact exist in
the Agreement.  The e-mail appeared to be a pitch for additional
work: "As we discussed in October of last year, Hindsight can be
flexible with respect to payment of the true-up referenced
above, particularly in connection with any new engagements that
we undertake prior to the end of the current term."  PTX 35.

102. On March 24, 2011, Hindsight sent Invoice Number 6
under the Agreement to Citi for audit defense work.  PTX 38.
Invoice Number 6 states that the "Job" was to "Advise and Assist
Citi's efforts to defend Citi against KPMG's out of compliance
audit findings associated with IBM-FileNet legacy software
licensing and maintenance cost."  PTX 38.  The invoice sought to
charge $3,581,668.60, an extraordinary sum in view of the
absence of any work order or other contract authorizing such
work.  Invoice Number 6 bore the same purchase order as the
original deactivation project invoices and was sent under the
Agreement.  Tr. 498.

**XI. THE FALL 2009 COMMUNICATIONS**

103. By October 2009, Hindsight had not been retained for
any new assignments by Citi, notwithstanding the success under
the Agreement.  On October 15, 2009, Hinds sent an e-mail to
Crane stating that "Citi has already recognized . . . additional
software cost savings" because of Hindsight's work.  PTX 85.

48

The October 15 e-mail also stated that "[p]rior to Citi
requesting that we remove the software license savings language
from the initial project, both Citi and [Hindsight] had always
discussed the software AND annual maintenance saving associated
with Hindsight Solutions recommendations."  PTX 85 (emphasis in
original).  For the first time in any document sent to Citi,
Hinds referred to a purported "freeze."  PTX 85.  Hinds asserted
that "Citi requested that [HindSight] table the software savings
compensation discussions (in Oct-Nov 2008, due to a Citi user
deployment freeze). . . ."  PTX 85.  The e-mail also stated:
"After Citi's request, only the software maintenance was
considered 'in scope' as Citi placed a hold on all FileNet
software new user deployments indefinitely."  PTX 85.  Neither
Scheibelhut nor Hatter are copy recipients of the e-mail.  The
e-mail does not make any accusations against either Scheibelhut
or Hatter.  Tr. 447.

104. Crane forwarded the e-mail to Scheibelhut later the
same morning.  In his cover e-mail, Crane explained: "Do you
recall this?  From my perspective the engagement was always
about reducing our software maintenance.  I do specifically
remember reviewing his edits in the SOW and striking any
reference to actual software cost savings."  PX 85.  Eight

minutes later, Scheibelhut responded with an e-mail to Crane

that expressed incredulity with the concept of a user freeze:

> [O]k, boil it down for me.  He wants additional payments
> for ongoing savings as we add people to Filenet during the
> first 24 months?  Is that it?  Does he refund us money if
> we remove users? Just because I'm curious, are there user
> accounts that could/should be deleted if we audited that
> table?

DX 217.  The response is perfectly credible and consistent with

Scheibelhut's testimony that he had not heard about a user

freeze and did not know what it meant.  It was unreasonable and

not credible for Hinds to think that the Citi payroll was static

with no new hires added who needed to use software and no people

who left and no longer used the software.  The very ambiguity of

the alleged representation undercuts Hinds's testimony that it

was made or relied upon.

105.  On October 21, 2009, Scheibelhut and Hinds had a

telephone conversation.  DX 220; Tr. 705.  Scheibelhut later

informed Crane of the conversation in an October 22, 2009

instant message, stating that Hinds "backed off the software

money."  DX 220.  Scheibelhut stated that Hinds wanted him to

commit to include software savings in the next agreement but

Scheibelhut refused because it felt "way too open ended."  DX

220.  Scheibelhut also reported the issue in an internal Citi

report—the REL IT Weekly which was circulated on October 20,

2009.  DX 219.  That report states:

> Hindsight Solutions recently brought up conversations that
> took place approximately one year ago when working on the
> FileNet SOW.  They've stated the conversations were to
> table the software savings compensation for Hindsight and
> would revisit when/if Citi deploys new users within 24
> month period.  Their attempt to include software cost
> savings, in addition to annual maintenance saves, was
> unsuccessful in the negotiations.  It's REL's view that
> annual maintenance saves was always the engagement model.
> Additional discussions regarding new business are being
> halted until this issue is resolved.

DX 219.  The halt on new business discussions was apparently

lifted in view of Hindsight's willingness to drop the software

discussions.  In an e-mail dated October 27, 2009, copied to

Scheibelhut, Crane wrote:

> The future engagement(s) for REL IT and Hindsight Solutions
> is no longer at a stand-still due to Hindsight's eagerness
> to discuss software cost savings in the current FileNet
> agreement.  After a number of conversations, the vendor has
> agreed to drop the software cost savings discussions and
> the partnership is now back to a business as usual mode.

DX 222.  None of the contemporaneous correspondence suggests

that Citi agreed with Hinds's October assertion that he was told

there was a user deployment freeze or that Citi had agreed to

pay him for software savings in addition to maintenance savings.

106. Hinds sent an e-mail to Crane dated November 4, 2009,

in which he made it clear that he was attempting to document

savings so that he could obtain additional work from Citi, not because he was entitled to compensation for his past work:

> In regards to the actual new users related to FileNet software, Gil suggested he wanted us to determine where the new users *(added in 2009)* were coming from so, we can make sure we properly document future [work order] language. Note, this justification has nothing to do with compensation for [Hindsight]. This is simply about accurately documenting the total save associated with our recommendations. Documenting the actual save *(not just initial maintenance save)* is geared towards helping Scott, Mark, & Hindsight Solutions independently sell the value of [Hindsight] services to other groups within Citi *(more exposure is usually associated with greater savings opportunities)*. . . . As Gil and I discussed two weeks ago, I'm trying to pursue opportunities with other groups within Citi . . . where justifying the value of [Hindsight] efforts will be evaluated on actual savings over a 60-month period *(not just initial maintenance savings)*. Note, these joint efforts have nothing to do with the projects that we will potentially be engaged.

DX 224 (italics in original).

107. Meanwhile, on November 2, 2009, Hinds sent an e-mail to Ray McGuire seeking his help to introduce Hinds to others within Citi in order to obtain new work from Citi. DX 227. Hinds attached his July 30, 2009 e-mail to McGuire in which Hinds described the maintenance deactivation project as a "tremendous win" for both Citi and Hindsight. DX 227. Hinds testified that, in sending this e-mail in November 2009, he believed the Agreement between Hindsight and Citi was a "big success." Tr. 444-45. Nowhere in Hinds's correspondence with

McGuire does Hinds complain that he was defrauded or in any way underpaid by Citi.

**XII. HINDSIGHT FAILS TO GET ADDITIONAL WORK FROM CITI AND THIS LAWSUIT ENSUES**

108. Throughout 2009 and 2010, in an effort to obtain additional consulting work throughout Citi, Hinds contacted Citi and described the savings Hindsight achieved.  DX 227; DX 229. Hindsight did not enter into any contracts or receive any work orders other than the Agreement and Work Order.  See Tr. 507-08. While he continued to market his services to Citi, Hinds had actual knowledge of an upward fluctuation in FileNet users. Tr. 246-47.

109. Hinds testified that in December 2010 or January 2011, he spoke with Scheibelhut about getting information "to validate the actual savings" for 24 months.  Tr. 265.  Hinds testified that in the course of that conversation Scheibelhut admitted that he had represented to Hinds "during the contract time that there was a deployment freeze."  Tr. 268.  This testimony is not credible and Scheibelhut credibly denied making any such statement.  Tr. 647-48, 709.

110. On March 30, 2011, after Hindsight failed to obtain any new work from Citi, despite two years spent trying to obtain

such work, Hinds sent an e-mail to Hatter explaining that he intended to send new invoices to Citi:

> Just so there are no surprises, I wanted to let you know that our Counsel has advised [Hindsight] to invoice Citi for the fees we deem outstanding as of end of business today. On that note, I will forward your team the invoices as well as provide to the corporate execs involved.

PTX 37. Hinds testified that the "counsel" he was referring to in the e-mail was "general business counsel." Tr. 271, 496. The invoices, numbered 4, 5, and 6, were issued pursuant to the same purchase order as the original invoices paid under the Agreement. Tr. 498; PTX 38; DX 179. Invoice 4 sought $1,014,103.13 for additional maintenance cost savings. Invoice 5 sought $2,268,336 for actual software savings. Invoice 6 sought $3,581,688.60 for "IBM – KPMG Audit Defense." PTX 38. It is unclear how these amounts were calculated, and they were not justified under the Agreement. Hinds admitted that the amounts were only a "guesstimate as to what I thought I would accept and what I thought they would accept, as an offer of compromise, without any reluctance, and I would be able to move on, they would be able to move on without having to get into a legal battle." Tr. 271-72. Although purporting to be regular invoices, the documents were simply a negotiating tactic. Citi rejected these invoices and Hindsight instituted this action. PX 39.

## XIII. THERE ARE NO "SOFTWARE SAVINGS" ATTRIBUTABLE TO HINDSIGHT'S WORK

111. There was no evidence adduced at trial attributing "software savings" or any other savings to Hindsight separate and apart from the Deliverables.  Tr. 884-86.  CitiMortgage had sufficient licenses to cover users it added before Hindsight was hired and Plaintiff offered no evidence to the contrary.  See DX 150; PTX 91; PTX 97.  Whatever Hindsight claims it may have done to "restructure" CitiMortgage's licenses, there is no evidence in the record as to what that "restructure" involved.  See Tr. 179-80, 183-85.  Hinds recommended that maintenance on various licenses be deactivated, and made recommendations as to how the remaining licenses could be used, but IBM never accepted that summary.  The net effect of the Hindsight work was to cease maintenance on various licenses which resulted in maintenance savings to Citi for which Hindsight was paid.  There is no evidence that the Master Contract with IBM or any of the licenses were modified in any way.  There also is no evidence that Hindsight's Deliverables saved Citi anything other than maintenance for which Hindsight was fully compensated under the Agreement.

112. From 2009 to 2011, Citi added employees who used the FileNet system.  PTX 91.  There is no evidence that CitiMortgage

added a new FileNet system or software to accommodate these new users. There is no evidence that IBM required Citi to obtain any new software licenses for the new users. Similarly, there is no evidence that CitiMortgage referred to or relied upon the Deliverables when these new users were added. Hindsight had knowledge of the users on the FileNet system as part of its deactivation analysis and, in fact, in February 2009 had discussions with Citi regarding new users on the FileNet system without ever suggesting it affected Hindsight's compensation under the Agreement. DX 147; DX 190; DX 249; Tr. 199-200.

113. Hindsight points to the contentious history between Citi and IBM in which IBM attempted to restrict Citi's FileNet licenses to business specific entities. PTX 46; PTX 63; PTX 106. IBM attempted to get Citi to purchase additional licenses or restructure existing licenses for a substantial payment to IBM. PTX 106. Citi, on the other hand, points to the controlling IBM-FileNet Contract that allowed software to be used by "Affiliates" and defined "Affiliates" broadly. See PTX 6, at 95961, 95975. In the Agreement, the parties agreed that Hindsight's work would not restrict the "current rights" of CitiMortgage to authorize business affiliates to use any unused active licenses. DX 129. Regardless of any dispute between Citi and IBM about Citi's rights to use licenses among affiliates,

nothing Hindsight did altered the contract Citi had with IBM or Citi's rights as against IBM.  Tr. 455.  Furthermore, there is no evidence that IBM has successfully pursued Citi to purchase additional licenses from IBM.

114. Citi did not add any affiliates to FileNet during the time relevant to this dispute.  Tr. 782.  Hindsight has failed to introduce any evidence that CitiMortgage added any users that would have required CitiMortgage to purchase new licenses but for Hindsight's "restructuring."  Ford testified credibly that Citi did not have any software savings.  Tr. 884.  Crane confirmed that if new users were added above Citi's limits, Citi could have reactivated the maintenance on the licenses it deactivated.  Tr. 778.

**CONCLUSIONS OF LAW**

1.   To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law.

2.   The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

3.   New York law governs all of the claims in this case. The breach of contract claim is governed by New York law because the Agreement provides that it is governed by New York law.  DX 129, at 19.  With respect to the remaining fraud and

quasi-contractual claims, the parties have assumed that New York law applies and have only briefed New York law.  The Court can accept that agreement.  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent ... is sufficient to establish choice of law.'") (internal citation omitted).

### I. PLAINTIFF'S BREACH OF CONTRACT CLAIM FAILS

4.    To establish a breach of contract claim, Hindsight must prove by a preponderance of the evidence: (1) the existence of a contract between Hindsight and CitiMortgage; (2) that Hindsight fully performed its obligations under the contract; (3) that CitiMortgage breached the contract; and (4) that Hindsight incurred damages as a result of that breach.  Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).

5.    Hindsight has failed to prove that CitiMortgage breached the Agreement in any way.  CitiMortgage paid Hindsight, pursuant to the Agreement, "30% of the actual savings . . . recognized by [CitiMortgage] for a two year period, off the stated Annual maintenance costs currently billed to [CitiMortgage]."  DX 129, at 28.

6.     Under the Agreement, any payment to Hindsight is based
on comparing the original IBM quotes for FileNet maintenance
with the 2009 and 2010 IBM FileNet maintenance quotes.  DX 129,
at 28.  In March 2009, Hindsight and CitiMortgage compared the
2009 and 2010 maintenance quotes and together calculated the
precise amount of the three equal payments due under the
Agreement, $709,690.83.  DX 161.  Hindsight invoiced
CitiMortgage these amounts and Hindsight was paid in full on its
invoices.  DX 179; PTX 25.  Accordingly, there are no amounts
due and owing under the Agreement.  Hindsight has failed to
prove that CitiMortgage breached the Agreement in any way. It
also follows that Hindsight has failed to prove that Hindsight
sustained any damages at all.

7.     In its Post-Trial Proposed Findings of Fact and
Conclusions of Law, Hindsight contends that it was re-engaged to
do the audit defense work and this constituted "mutual assent to
a new contract embracing the same provisions and terms as their
prior contract." N. Am. Hyperbaric Ctr. v. City of New York, 604
N.Y.S.2d 56, 57 (App. Div. 1993).

8.     This assertion is without merit.  First, the Joint
Pre-trial Order contained no allegation that the breach of
contract claim was based on a new contract after the previous
contract was completed.  Second, there is no credible evidence

that a new contract relating to the KPMG audit was in fact created.  Hinds himself testified that he considered the audit defense work to be performed under the Agreement and that this work should be compensated as part of the "actual savings" under that Agreement, Tr. 495, which is simply contrary to the terms of the Agreement which limited savings to actual maintenance savings.  DX 129, at 28.  Moreover, Greg Crane, the person who allegedly hired Hindsight for the audit work, testified credibly that he had no authority to hire anyone, that he believed that Hindsight's work was part of its obligations under the original Agreement, and that no compensation was ever discussed with Hindsight.  Tr. 794-97.  There was no new agreement formed and Hindsight was not damaged in any way.

### II. PLAINTIFF HAS FAILED TO BEAR ITS BURDEN TO PROVE FRAUD

9.   To prevail on its claims for fraudulent misrepresentation and fraudulent inducement under New York law, Hindsight must prove five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact, (2) made by defendant with knowledge of its falsity (3) and an intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006) (citing

60

_Schlaifer Nance & Co. v. Estate of Warhol_, 119 F.3d 91, 98 (2d Cir. 1997).

10.  The clear and convincing evidence standard "demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory" because "fraud will not be assumed on doubtful evidence or circumstances of mere suspicion." _Century Pac., Inc. v. Hilton Hotels Corp._, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), _aff'd_, 354 F. App'x 496 (2d Cir. 2009); _MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc._, 157 F.3d 956, 961-62 (2d Cir. 1998) (affirming dismissal of fraud claim after bench trial where the documentary evidence contradicted and the defendant denied making an alleged false representation).  The plaintiff has failed to meet this standard for each of the five elements of its fraud claim.

11.  The plaintiff has failed to prove by a preponderance of the evidence, much less by clear and convincing evidence, that any Citi employee made any misrepresentation.  As explained in detail in the Findings of Fact, the plaintiff's allegations that Scheibelhut, with the agreement of Hatter, represented that there was a "software deployment freeze" or a "user freeze", were credibly denied by Scheibelhut and Hatter and are not credible.  Accordingly, Plaintiff's fraud claim should be dismissed.  _Rojo v. Deutsche Bank_, No. 06cv3574, 2010 WL

2560077, at *4 (S.D.N.Y. June 23, 2010), aff'd, 487 F. App'x 586 (2d Cir. 2012) (dismissing fraud claim after bench trial because the evidence did not support the existence of a misrepresentation).

12.  It also follows that the plaintiff has failed to prove that any Citi employee made any false statement with knowledge of its falsity or demonstrated conscious misbehavior or recklessness.  See Gould v. Winstar Commc'ns, Inc., 692 F.3d 148, 158 (2d Cir. 2012) (holding that "conscious misbehavior and recklessness" under Section 10(b) of the Securities Exchange Act require a showing of "deliberate illegal behavior" or "highly unreasonable behavior", respectively); King Cnty., Wash. v. IKB Deutsche Industriebank AG, 916 F. Supp. 2d 442, 447 (S.D.N.Y. 2013) (stating that the scienter standard for New York common law fraud is the same as under Section 10(b)).  While Hinds had originally alleged that Scheibelhut admitted he made a false statement relating to the software deployment freeze, Scheibelhut credibly denied that allegation and Hinds's testimony to the contrary is not credible.

13.  Therefore, Hindsight has failed to prove scienter by a preponderance of the evidence, much less by clear and convincing evidence.  See E-21 Global, Inc. v. Second Renaissance, LLC, 360 F. App'x 172, 175 (2d Cir. 2009) (summary order) (affirming

dismissal of fraud claim for failure to prove scienter by clear and convincing evidence).

14.   Because there were no misrepresentations, the plaintiff cannot prove reasonable reliance.   Moreover, the factual record in this case also underlines why there cannot be any claim of reasonable reliance.   The alleged misrepresentation of a "software deployment freeze" and a "user freeze" are vague on their face because they do not explain what the terms might possibly mean, such as whether new hires at Citi would be able to use software, whether departing hires would be subtracted from a user freeze, whether any such freeze would refer to net users, and why if this representation was so important there is no written memorandum or e-mail reflecting such a freeze. Moreover, if these representations were so important to Hindsight, a reasonable business person would have expected them to be included in the contract, but they were not.   Courts in this Circuit uniformly hold that in cases "involving sophisticated parties and high-stakes transactions—a party lacking information cannot reasonably rely on oral representations from a negotiator on the other side of a proposed transaction, and must be expected to demand documented confirmation or otherwise perform basic due diligence." Baraliu v. Vinya Capital, L.P., No. 07cv4626, 2009 WL 959578, at *8

(S.D.N.Y. Mar. 31, 2009) (citing <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1543 (2d Cir. 1997)). <u>See also</u> <u>Rojo</u>, 2010 WL 2560077, at *5.

15.  The Agreement contained an integration clause stating that it constituted the "complete understanding of the Parties." DX 129, at 22.  "[E]ven if an integration clause is general, a fraud claim will not stand where the clause was included in a multimillion-dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract."  <u>Consol. Edison, Inc. v. Ne. Utilities</u>, 249 F. Supp. 2d 387, 403-04 (S.D.N.Y. 2003), <u>rev'd in part on other grounds</u>, 426 F.3d 524 (2d Cir. 2005).

16.  The Agreement contained three pages of Representations and Warranties, none of which concerned the number of FileNet users or guarantees to revisit compensation.  DX 129.  Hindsight did not ask to include the purported agreement to "revisit" software savings in the Agreement or seek representations or warranties concerning the number of FileNet deployments notwithstanding the three pages of representations and warranties contained in the Agreement.  The failure to include such protective language in the contract renders reliance on any

alleged misrepresentation unreasonable.  See, e.g., Lazard
Freres, 108 F.3d at 1543.

17.  The plaintiff has failed to establish by a
preponderance of the evidence, much less by clear and convincing
evidence, that it reasonably relied on any statements made by
the defendants.

18.  The plaintiff's fraud claims are also barred because
it has failed to prove that it incurred any out-of-pocket
losses.  The plaintiff has failed to prove that it incurred any
expenses or other monetary damages from performing under the
Agreement or doing the work in connection with the KPMG audit
that it would not otherwise have incurred under the Agreement.
The plaintiff is essentially seeking "benefit of the bargain"
damages in which it argues that it saved Citi various software
expenses and costs that Citi would have incurred had KPMG not
retreated from its prior position.  But these are the kinds of
damages that are barred by New York's out-of-pocket rule.  Lama
Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996).  In
New York, "the loss of an alternative contractual bargain cannot
serve as a basis for fraud or misrepresentation damages because
the loss of the bargain was undeterminable and speculative."
Ritani, LLC v. Aghjayan, 970 F. Supp. 2d 232, 251 (S.D.N.Y.
2013) (quoting Lama, 88 N.Y.2d at 421).  See also Rather v. CBS

Corp., 886 N.Y.S.2d 121, 127 (1st Dep't 2009) (holding that to recover under Lama, plaintiff had to "plead that he had something of value, was defrauded by [the defendant] into relinquishing it for something of lesser value, and that the difference between the two constituted [the plaintiff's] pecuniary loss").  The plaintiff thus cannot show damages for its fraud claim.

### III. PLAINTIFF'S QUASI-CONTRACT CLAIMS FAIL

19.  Each of the plaintiff's quasi-contract claims fail because each arises from the same subject matter as the Agreement.  See Rojo, 2010 WL 2560077, at *6 (dismissing quasi-contract claims after bench trial due to existence of valid contract "because [quasi-contract claims] serve as equitable remedies that operate where no valid contract exists"); Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 176 (2d Cir. 2005) (rejecting quantum meruit claim because contract claim encompassed the work for which "plaintiff seeks compensation in quantum meruit").

20.  The Agreement bars the Plaintiff's quasi-contract claims because "the scope of the [Agreement] clearly covers the dispute between the parties." Mid-Hudson, 418 F.3d at 175. Hindsight has not shown that it performed any additional services that were "so distinct from" its contractual duties

66

that "it would be unreasonable for [CitiMortgage] to assume that they were rendered without expectation of further pay." Id. at 175-76 (quoting U.S. E Telecomms. v. US WestCommc'ns Servs., 38 F.3d 1289 (2d Cir. 1994)).

21.   Each of the plaintiff's quasi-contract claims relating to software savings arises from its attempt to receive additional compensation for the work it performed pursuant to the Agreement.  Hinds's only advice was contained in the Deliverables, DX 136 and DX 150, and the Deliverables were provided pursuant to the Agreement.  Hinds's advice with respect to the KPMG audit of FileNet was also reasonably part of his work under the Agreement, as he himself testified.  Tr. 495. Hindsight's quasi-contractual claims, therefore, arise from work done under the Agreement.

22.   Hindsight seeks compensation for software deployment savings that it contends Citi obtained as a result of the Deliverables.  There is in fact no evidence of such software savings.  In any event, whatever savings Hindsight believes were achieved resulted from the Deliverables for which Hindsight was paid under the Agreement and from the KPMG audit work which was also part of the work under the Agreement.  Furthermore, Hindsight has admitted that it seeks the same damages for its contractual claims as it does for its quasi-contractual claims.

67

Aug. 20, 2013 Hr'g Tr. 4.  Accordingly, the quasi-contractual
claims fall within the scope of the Agreement and, therefore,
must be dismissed.  See, e.g., Orenstein v. Brum, 811 N.Y.S.2d
644, 646 (App. Div. 2006) (quantum meruit claim dismissed
seeking compensation for "precisely the same amounts for
precisely the same services alleged in the breach of contract
claims").

23.  With respect to the KPMG-audit claims, the record
establishes that work that Hindsight did was limited to FileNet.
Hindsight was required under the Agreement to provide these
services.  Moreover, Hindsight did not discuss with Citi that it
expected to be paid or that Citi expected to pay Hindsight for
its FileNet related assistance.

24.  The structure of the contractual relationship between
the parties was governed by the Master Services Agreement, which
envisioned separate work orders for each distinct piece of work
to be performed by Hindsight.  It was reasonable for
CitiMortgage to expect Hindsight to request compensation if it
expected to be paid for the KPMG work, and to seek a separate
work order for any work not covered by a prior work order.
Because the plaintiff did not request another Work Order other
than the original one, and rendered even its 2011 invoices under
that Work Order, PTX 38, any claims for the compensation

68

reflected in those invoices is plainly within the scope of the Agreement and was fully compensated when Citi paid the invoices in 2009.  See Fredericks v. Chemipal, Ltd., No. 06cv966, 2007 WL 1310160, at *6 (S.D.N.Y. May 3, 2007) (dismissing attorney's quantum meruit claim for a contingent fee that the attorney had also sought under a retainer agreement).

25.  Hindsight's quasi-contract theories fail for additional reasons.  Hindsight's unjust enrichment, promissory estoppel, and quantum meruit claims are all without merit.

26.  To prevail under an unjust enrichment theory under New York law, a "plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J. Inc., 448 F.3d 573, 586 (2d Cir. 2006).

27.  Under the terms of the Agreement, the defendants paid Hindsight in full for the work that it performed for them — the Deliverables.  Consequently, even assuming Hindsight's work resulted in additional "software savings" for CitiMortgage, CitiMortgage was not unjustly enriched at Hindsight's expense. See Ocean Grp. LLC v. Marcal Mfg., LLC, 09cv7679, 2010 WL 4963155, at *11 (S.D.N.Y. Dec. 2, 2010) (dismissing claim of unjust enrichment based on defendant's dramatic increase in

sales where plaintiff was compensated in accordance with the contract). In fact, as noted above, there is no evidence that Citi enjoyed any "software savings" because of Hindsight's work.

28. With regard to the audit, Hindsight's discussion on the one call he had with KPMG was consistent with his defense of his work in deactivating various licenses and indeed, when he transmitted the Deliverables, Hinds had offered to be available to answer any questions or concerns that might arise in future conversations relating to IBM. DX 179; Tr. 869. Accordingly, Citi was not unjustly enriched by not paying Hinds for the defense of his own work which he had offered to provide.

29. In New York, "promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by" the plaintiff. Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995) (quoting Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir. 1989)).

30. The plaintiff's promissory estoppel claim fails. None of the elements has been met. There was no clear and unambiguous promise made outside of the Agreement. There was no reasonable reliance, and there is no evidence of any injury to Hindsight. See, e.g., R.G. Grp., Inc. v. Horn & Hardart Co.,

751 F.2d 69, 78-79 (2d Cir. 1984) (affirming dismissal of promissory estoppel claim based on purported promises made during contract negotiations subject to a final written agreement); Stein v. Gelfand, 476 F. Supp. 2d 427, 436 (S.D.N.Y. 2007) (dismissing promissory estoppel claim because plaintiff's reliance on brief conversation as constituting an agreement that left key terms for "future resolution" was manifestly unreasonable).

31.  To establish a claim for quantum meruit, the plaintiff must show "its good faith performance of services, the defendant's acceptance of those services, an expectation of compensation for the services, and the reasonable value of those services." Skillgames, LLC v. Brody, 767 N.Y.S.2d 418, 422 (App. Div. 2003).

32.  The Agreement bars the plaintiff's quantum meruit claim concerning its assistance on the KPMG audit.  The plaintiff never demonstrated a reasonable expectation of payment separate from the Agreement because the plaintiff never requested a separate work order, never made a contemporaneous request for payment or even discussed compensation for the work at the time it was done, and submitted a 2011 invoice identified as "associated with IBM – FileNet legacy software licensing and maintenance cost."  PTX 38; see Leibowitz v. Cornell Univ., 584

F.3d 487, 509-10 (2d Cir. 2009) (affirming dismissal of quasi-contractual claims where "plaintiff has offered no evidence that she expressed an expectation of compensation prior to the performance of the services"); Soumayah v. Minnelli, 839 N.Y.S.2d 79, 81 (App. Div. 2007) (dismissing plaintiff's quantum meruit claim where plaintiff had no reasonable expectation of compensation).

33.  The plaintiff's claim for quantum meruit damages in connection with the purported "software savings" fails for the same reason.  The plaintiff performed pursuant to the Agreement by sending the defendants the Deliverables related to license deactivations and maintenance costs.   The plaintiff already has received payment for this work and could not have reasonably expected to receive additional compensation above and beyond what was provided in the Agreement.  See Leibowitz, 584 F.3d at 509-10.

34.  Moreover, the plaintiff has failed to establish a basis to determine the alleged "reasonable value of the services" it provided, whether in connection with any purported software savings or in connection with the KPMG audit.  Because the plaintiff has offered no evidence of the hours purportedly spent, nor any reasonable basis for calculating the value of his purported services, dismissal of the plaintiff's quantum meruit

claim is warranted.  Schafrann v. Karam, No. 01cv0647, 2003 WL
289620, at *7 (S.D.N.Y. Feb. 10, 2003), aff'd, 81 F. App'x 391
(2d Cir. 2003) (dismissing quantum meruit claim after bench
trial because plaintiff had not submitted proof of the
reasonable value of his services).

35.  The plaintiff also cannot show that any exception
applies to the general rule that quantum meruit damages are
based on an hourly rate.  See Carlino v. Kaplan, 139 F. Supp. 2d
563, 565-66 (S.D.N.Y. 2001) (refusing to award plaintiff quasi-
contract damages based on an incentive scheme).  Hindsight
argues that it should be awarded 30% of the savings that Citi
allegedly received as a result of Hindsight's work on the audit,
but Hindsight has offered no evidence that there are any "clear
and accepted market place conventions" of paying consultants
like Hindsight on a percentage basis.  See Carlino, 139 F. Supp.
at 565; Learning Annex Holdings, LLC v. Rich Global, LLC, 860 F.
Supp. 2d 237, 248 (S.D.N.Y. 2012) (reversing jury verdict
awarding damages for quantum meruit claim based on percentage of
royalties because no "clear and accepted market place
convention" was established).

36.  The plaintiff also appears to argue that it is
entitled to damages based on numerous additional software users
that Citi has added.  However, any claim Hindsight makes for

73

damages based on alleged software savings is speculative because Hindsight failed to call either an expert or an IBM representative as a witness.  The plaintiff's calculations are also speculative because they appear to relate to users that are added without taking into account users that are deleted. In any event, there is no evidence as to why the Plaintiff is entitled to compensation for such users.  There is no evidence that IBM, which monitors the use of the system through the same metrics provided to the plaintiff, has required Citi to purchase additional licenses, or what the cost of such additional licenses would be.  For its calculations as to the cost of new licenses, the plaintiff has relied on PX 28 which is an IBM price list for a contract with New York State that the plaintiff obtained from the internet.  This exhibit should be stricken as irrelevant.  There is an insufficient basis to conclude that the prices IBM charged to New York State would be the same prices charged to Citi, particularly when Citi has received hefty discounts in the past.  Tr. 97, 225-26.  Therefore, the plaintiff cannot show any damages based on any alleged software savings.

## CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.  The Court has considered all of the

arguments of the parties.  To the extent not specifically discussed above, any remaining arguments are either moot or without merit.  For the reasons explained above, all of the Plaintiff's claims are dismissed with prejudice. The Clerk is directed to enter Judgment, to close all pending motions, and to close this case.

**SO ORDERED.**

**Dated: New York, New York**
        **October 16, 2014**                  _____/s/_____
                                               **John G. Koeltl**
                                    **United States District Judge**